J-S41017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF E.R.K. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.A.K., FATHER | No. 410 MDA 2015 |

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s): 89 DP 2014

BEFORE:  ALLEN, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 24, 2015**

W.A.K. ("Father") appeals from the order entered in the Court of Common Pleas of Tioga County, which involuntarily terminated his parental rights to his minor daughter, E.R.K.  We affirm.

E.R.K., born March 2011, was placed in the care of M.S. and P.S. ("Petitioners")[1] on April 11, 2013 by voluntary agreement among Father, natural Mother[2] and Petitioners.  This agreement was reached after Tioga

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Petitioners, M.S. and P.S., reside in Carlisle.  M.S. is Natural Mother's cousin, and her family consists of her husband, P.S., their two children (ages 10 and 16), and paternal grandmother.  M.S. is a homemaker with a master's degree in management; P.S. is a captain with the Montgomery County Department of Fire and Rescue Services in Maryland.  **See** N.T. Hearing, 1/22/15, at 96.  Petitioners have filed a notice of intent to adopt.

[2] Mother consented to voluntary terminations of her parental rights to E.R.K. and signed a Consent to Adoption on October 29, 2014.  Mother has filed a brief in support of the trial court's order terminating Father's parental rights.

County Department of Human Services (DHS) filed a dependency petition. As a result of the voluntary agreement, the DHS withdrew the dependency petition.[3] E.R.K. has resided with Petitioners continuously since her placement, and she refers to Petitioners as "mommy" and "dad."

DHS Supervisor Christine Dinger testified that Father indicated he wanted to be custodian of E.R.K. At the time, Father was living at his grandmother's home. Dinger visited Father's grandmother's home, which consisted of two trailers put together, and concluded that it was not an appropriate placement for E.R.K. Father's mother had been sick for two years, and there was a strong odor of urine and mounds of garbage outside the trailers. N.T. Termination Hearing, 1/22/15, at 21-22. At the time of the hearing, Father resided in a two-bedroom apartment with his mother. *Id.* at 29.

Since April 2013, Father has had one (1) visit with E.R.K., which lasted for approximately 1½ hours. *Id.* at 36, 43. Father has had no phone contact with E.R.K., nor has he requested such. He has sent no cards, gifts or other items to E.R.K. since her placement. *Id* at 44, 81. Father lives

_____

[3] Father and Mother signed a stipulation transferring custody of E.R.K. to Petitioners. Father was represented by counsel. At the termination hearing, Father testified that he believed the stipulation was temporary, although he did not know whether the agreement in fact stated as much. N.T. Hearing, 1/22/15, at 38-39. Father acknowledged that that he made no efforts to modify that custody arrangement; he also acknowledged that he was represented by counsel at the time he signed the agreement. *Id.* at 39.

with his own mother, and although he has said his mother is willing to provide transportation for him to visit E.R.K., he did not pursue that opportunity. *Id*. at 29. Since E.R.K. has been in placement, Father has not provided any support.[4] *Id*. at 77.

Father acknowledged at the hearing that he had not performed parental duties for the previous year, 2014, or for 2013. *Id*. at 53-54. Petitioner M.S. testified that she received no text messages from Father in 2013, no "message for wishing her a Merry Christmas in 2013, or her birthday or anything." *Id*. at 79. She did receive an email from him in August 2013 "saying I'm out of jail bring E.R.K. so I can see her." *Id*. Father's explanation for his absence from E.R.K.'s life was that Petitioners would not respond to his text messages. *Id.* at 55. However, Petitioner M.S. testified that "[t]here have been a few times when I've told him that we were coming and he's either been in jail or when I've talked to his grandmother she didn't know why he hadn't answered." *Id.* at 73. She

_____

[4] Father's history includes an "indicated" report of abuse involving a three-year old male child filed with the Department of Public Welfare. N.T. Hearing, 1/22/15, at 12. The child, the son of a paramour of Father's, was taken to the hospital for "blunt force trauma to the genitals." *Id.* at 11-12. Criminal charges were filed; that case was later withdrawn after the preliminary hearing when the child could not physically identify Father. *Id.* at 13. Child Protective Services worker Jennifer Watson testified that the incident occurred two years prior to the investigation and preliminary hearing, and that "the child couldn't physically identify [Father] after not seeing him for two years." *Id.* at 15.

stated that she offered to bring E.R.K. to visit over Thanksgiving of 2013 and testified that she is willing to allow contact between Father and E.R.K., and that from her own personal experience she believes it is important that a child know who his or her biological parents are. *Id.* at 72-73. She also testified that Father never asked her for their address, never offered to visit their home to see E.R.K., never attempted to arrange visitation on his own, and never asked to talk to E.R.K. on the phone. *Id.* at 90-91.

The court found that Petitioners provide a loving, supportive and stable home for E.R.K. They provide medical insurance for E.R.K., have enrolled E.R.K. in a preschool program, and include her in family activities and vacations.

Father admitted he essentially had no bond with E.R.K., and testified that he believes there is a bond between E.R.K. and Petitioners. *Id.* at 43. The court found that the bond between Petitioners and E.R.K. is that of parents to child. Petitioners' other children refer to E.R.K. as a sibling, and E.R.K. refers to them similarly. *Id.* at 68-70.

On September 19, 2014, after having custody of E.R.K. for eighteen (18) months, Petitioners filed a petition to terminate Father's parental rights[5]

---

[5] Petitioners sought to terminate Mother's parental rights at the same time. Mother thereafter voluntarily relinquished her parental rights and signed a Consent to Adoption the following month, on October 29, 2014. *See* footnote 2, *supra*.

under 23 Pa.C.S.A. §§ 2511(a)(1), (5), and (8).[6] The court held a termination hearing on January 22, 2015.

---

[6] § 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the court's decision as to one subsection of section 2511(a) in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

Further, our review is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the court's order must stand. Where a trial court has involuntarily terminated parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. *In re: Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 414 (Pa. Super. 2003).

This Court has stated that parental duty is best understood in relation to a child's needs, and that "those needs, physical and emotional, cannot be met by a merely passive interest in the development of the child." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004)(citation omitted). Thus, this Court has held that a "parental obligation is a positive duty which requires affirmative performance." ***Id.***

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. **Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.** Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***Id.*** (emphasis added). ***See also In re G.P.-R.***, 851 A.2d 967, 976 (Pa. Super. 2004) (holding: "It is incumbent upon a parent when separated from his child to maintain communication and association with the child.").

Here, Father's efforts have been neither consistent nor steady for the two-year period prior to the hearing. Father has not exerted himself or put forth sincere efforts to perform his parental duties. A parent wishing to reestablish his parental responsibilities bears the burden of proof on this

question. *See In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015). Despite his explanations for his failure to visit E.R.K., communicate with her, or send cards or gifts, and his testimony that he is working on getting his life together and getting his occupational driver's license, the bottom line is he has not parented E.R.K. for over two years, half of E.R.K.'s life. Father's lack of effort indicates that parenting E.R.K. has not been his priority, and his belief that he may be ready in six months to a year is, simply, not tenable. As the trial court stated at the conclusion of the hearing, "[a] child cannot be left to wait." *Id*. at 147. *See In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting").

After a careful review of the certified record, we conclude that the evidence presented supports the trial court's order. Petitioners have established by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant to section 2511(a)(1) (parent by conduct continuing for period of at least six months immediately preceding filing of petition either has evidenced settled purpose of relinquishing parental claim to child or has refused or failed to perform parental duties). Further, the record, including Father's own testimony, supports the court's determination under section 2511(b) that there is no bond between Father and E.R.K. and termination of Father's parental rights is in E.R.K.'s best interests. The bond between Petitioners and E.R.K. is strong and is one of

parents and child. E.R.K. was almost four years old at the time of the hearing, and Petitioners are the only parents she has ever known. It is apparent from our reading of the hearing testimony that E.R.K.'s physical and emotional health has blossomed since she has been in placement with Petitioners. There is little doubt termination would best serve her needs and welfare. 23 Pa.C.S.A. § 2511(b).

We find no error or abuse of discretion by the trial court. ***See C.W.S.M. and K.A.L.M.***, ***supra***. We, therefore, affirm the order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/24/2015